IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 24, 2014

## STATE OF TENNESSEE v. WALTER GEORGE GLENN

**Appeal from the Criminal Court for Hamilton County**
**No. 276199     Rebecca J. Stern, Judge**

_____

**No. E2013-01852-CCA-R3-CD - Filed July 7, 2014**

_____

A Hamilton County jury convicted the Defendant, Walter George Glenn, of second degree murder, and the trial court imposed a Range II sentence of thirty-five years of incarceration. On appeal, the Defendant contends that: (1) the evidence is insufficient to support his conviction; (2) the trial court erred in allowing a medical examiner to testify as to the cause of the death in violation of his right to confrontation; and (3) the trial court erred when it sentenced him by improperly applying enhancement factors and failing to apply mitigating factors. After a thorough review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J. AND D. KELLY THOMAS, JR., J., joined.

Benjamin L. McGowan (at trial) and Donna Robinson Miller (on appeal), Chattanooga, Tennessee, for the appellant, Walter George Glenn.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; William H. Cox, III, District Attorney General; Brian Finlay and Matthew Rogers, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

A Hamilton County grand jury indicted the Defendant for second degree murder for stabbing with a knife and killing his seventeen-year-old stepson, Carlton.

At trial, the parties presented the following evidence: Raven Glenn testified that, at the time of the crime, she was living with her mother and brother in the Boone Heights

apartment complex. She stated that the Defendant was her father and that the victim was her brother. Ms. Glenn testified that on December 20, 2009, she was at home with the victim when he left the house to go cigarettes. She said the victim was gone for a long time, causing her to think that something was not "right" about the situation. Shortly thereafter, the victim walked through the front door of the house and stated, "[the Defendant] got me." She said the victim yelled his mother's name and then collapsed on the floor. Ms. Glenn testified that there was blood "everywhere" and that the victim did not regain consciousness after he collapsed. Ms. Glenn described the victim as being thin and "about the same height" as the Defendant.

Heather Williams testified that she was a Chattanooga Police Department investigator assigned to investigate a crime scene located at 1907 Southern Street (hereinafter "1907 Southern"). She assisted another investigator, Investigator Brian Russell, in processing the crime scene. Investigator Williams stated that at the 1907 Southern location, blood stains were leading down the sidewalk, which made a "trail" that led to 1819 Southern Street (hereinafter "1819 Southern"). Investigator Williams testified that the trail of blood went onto the porch of 1819 Southern and that blood stains were on the door of the unit. Inside 1819 Southern, she found blood stains in the living room, leading to the victim who was "lying on the floor face down in a very large pool of blood."

Investigator Brian Russell, a Chattanooga Police Department officer, testified that he responded to the crime scene and that he found a blood trail leading from 1907 Southern to the front porch of 1819 Southern. Investigator Russell stated that he collected a cigarette butt from the sidewalk that had been "recently used[.]" Investigator Russell stated that he "swabbed" the blood stains on the sidewalk leading to 1819 Southern, as well as stains inside the residence. He stated that a "couple" of t-shirts were found on the sidewalk near the blood stains, as well as a hat, which he collected as evidence. Investigator Russell testified that the victim was dead at the time Investigator Russell arrived at 1819 Southern.

Damion Dillon testified that he was a close friend of the victim and that in December of 2009, the victim was living at 1819 Southern. On December 20, 2009, Mr. Dillon was visiting his cousin, Damion Dawson, who was also the victim's brother. Mr. Dillon said that he, Mr. Dawson, and the victim were walking to 1907 Southern when they met the Defendant on the sidewalk in front of the unit. Mr. Dillon recalled that the Defendant and the victim began arguing on the sidewalk of Southern Street. Both men were "cussing each other" and "arguing bad;" however, Mr. Dillon never heard either man make threatening remarks. He said he got into his car and drove off while the argument continued and that five minutes later he received a call on his cellular telephone notifying him that the victim was dead from a stab wound.

On cross-examination, Mr. Dillon agreed that he did not see the victim get stabbed. He agreed that the argument between the victim and the Defendant was over a cigarette, and that the victim had a "temper." He stated that he had testified at the preliminary hearing that the victim was angry with the Defendant over the cigarette. Mr. Dillon reiterated that he only heard the victim ask the Defendant for a smoke and the Defendant refuse, and then Mr. Dillon left the scene. Mr. Dillon said that, when he heard the Defendant was dead, his "immediate" thought was that the Defendant had killed him.

Vashawn Woods testified that he lived at 1901 Southern Street on December 20, 2009. On that day, from inside his residence, he heard arguing and saw the victim and the Defendant standing outside. He also observed Mr. Dillon getting into his car and leaving. Mr. Woods went out on his porch and told the victim to come inside. The victim responded that he was going to get three cigarettes from the Defendant, so Mr. Woods went back inside his residence. He continued to hear "hollering," and when he opened the front door he saw the victim "holding his neck." The victim had on pants and shoes, but he was not wearing a shirt. Mr. Woods stated that blood was "jumping" from the victim's neck, and then the victim started running down the street. Mr. Woods also saw the Defendant walking away from the scene with a knife in his hand.

On cross-examination, Mr. Woods said that the victim sounded angry and was cursing at the Defendant. He agreed that he asked the victim to come inside to calm him down because he was "pretty worked up." Mr. Woods recalled that the victim had asked the Defendant for cigarettes and weed and that he heard the Defendant refuse. Mr. Woods stated that he heard the Defendant say he was not going to sell "weed" to the victim because he was a minor. Mr. Woods agreed that he later gave a statement to police and that in the statement he said he had seen the victim "push" the Defendant. Mr. Woods testified that he meant he had seen the victim unintentionally "bump" the Defendant.

Mr. Woods testified that he saw the Defendant holding the knife in his left hand, and he acknowledged that he had told the police in a previous statement that the Defendant was holding the knife in his right hand. He stated that a tree obstructed his view of the Defendant at a certain point while he was walking away, but "when [the Defendant] came from behind the tree he had [the knife] in his right hand." Mr. Woods clarified that he had seen the knife in both of the Defendant's hands. He agreed that the Defendant was not running from the scene or attempting to conceal himself.

Mr. Woods recalled that, after he heard the victim ask the Defendant for cigarettes, he heard the victim say to the Defendant, "I'm going to beat your ass," to which the Defendant responded, "no, you won't, I'll kill you." Mr. Woods said that he did not tell the police about those statements when he was interviewed because he did not think the

statements were relevant.

Dr. Laura Boos testified that she was assigned to the serology DNA unit at the Tennessee Bureau of Investigation ("TBI"). She was qualified as an expert in the field of serology and DNA. Dr. Boos testified that she analyzed the cigarette butt found at the crime scene, as well as the DNA sample taken by Officer Burnette. She stated that the DNA found on the cigarette butt matched a DNA standard collected from the Defendant. Dr. Boos stated that she also tested the blood swabs taken from the sidewalk, front porch, and exterior walls and compared them with samples of the victim's blood. She stated that the swabs matched the victim's blood sample.

Dr. Frank King, the Hamilton County medical examiner, testified as an expert in forensic pathology. He stated that he examined the victim's body on December 21, 2009. He stated that he observed a stab wound to the left side of the victim's neck and that it appeared that the stab wound had been the cause of the victim's death. Dr. King testified that, based on the large amount of blood around the wound and on the outside of the victim's body, it was a "logical conclusion" that his death was related to the stab wound. Dr. King agreed that he sent the body to Knoxville for a pathologist to perform the official autopsy because his office was "overloaded" at the time. Dr. King stated that, because he thought the medical findings related to the victim's cause of death would be "straightforward," he considered this a good case to send out of the office. He stated that the Knoxville pathologist's report confirmed his opinion that the stab wound to the victim's neck was the cause of death.

On cross-examination, Dr. King stated that it would be possible for the victim to run down the street after sustaining the stab wound but before bleeding to death.

Louis Kuykendall testified that he was a United States Marshal working with the TBI to apprehend the Defendant in the Nashville, Tennessee area in February 2010. He stated that he found the Defendant at 1508 Lischey Avenue in Nashville. He stated that the Defendant was found in the crawl space of the house and arrested without incident.

Based on this evidence, the jury convicted the Defendant of second degree murder. The trial court conducted a sentencing hearing and imposed a sentence of thirty-five years. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) there is insufficient evidence to support his conviction; (2) the trial court erred when it allowed Dr. King to testify as to the victim's

cause of death; and (3) the trial court erred when it sentenced him by improperly applying enhancement factors and failing to apply mitigating factors.

## A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction because there were no eyewitnesses to the stabbing nor could anyone testify who "pulled the knife." The State responds that a rational trier of fact could conclude based on the evidence and testimony that the Defendant knowingly stabbed the victim, and thus, the evidence is sufficient to support his second degree murder conviction. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.

1973)).  The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)).  This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence.  *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)).  Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict.  *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another."  T.C.A. § 39-13-210 (2012).  "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result."  *Id.* § 39-11-302(b).  "To establish that a defendant committed a second degree murder, the State has the burden of proving beyond a reasonable doubt that (1) the defendant killed the victim, and (2) the defendant committed the killing with a 'knowing' state of mind."  *State v. Parker*, 350 S.W.3d 883, 904 (Tenn. 2011).

The evidence in this case, viewed in the light most favorable to the State, showed that the Defendant and the victim engaged in a heated argument on the sidewalk of Southern Street.  Mr. Woods witnessed the argument from his front door, and he testified that the argument between the two men was over cigarettes and marijuana.  After Mr. Woods closed his front door, he heard yelling from inside and opened his door to find the victim running away, with blood "jumping" out from his neck.  Mr. Woods saw the Defendant leaving the scene with a knife in his hand.  Crime scene investigators testified that based on the blood stains on the sidewalk, it was their determination that the victim walked down the sidewalk toward his house.  Ms. Glenn, the victim's younger sister, testified that the victim came home and told her that the Defendant had stabbed him.  He then collapsed on the floor and never regained consciousness. The county medical examiner testified that the victim died from the stab wound to his neck.  This evidence is sufficient evidence for a rational jury to conclude

that the Defendant knowingly stabbed the victim in the neck and killed him. The Defendant is not entitled to relief.

## B. Medical Examiner's Testimony

The Defendant next contends that the trial court erred when it overruled his objection and allowed Dr. King, who did not perform the official autopsy on the victim, to testify about the victim's cause of death. He contends that because the Knoxville pathologist, who performed the autopsy and ultimately determined the cause of death, was not present to testify, Dr. King's testimony about the cause of death violated his right to confrontation. The State responds that the trial court properly limited Dr. King's testimony to his own observations and opinion, based on his examination of the victim's body, and instructed him to clarify that his testimony was based on those observations and not those of the Knoxville pathologist. The State contends that, even if this testimony did violate the Defendant's right to confrontation, it amounted to harmless error because the cause of death was not raised as an issue at trial. We agree with the State.

The Confrontation Clause of the Sixth Amendment commands: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. This fundamental right of confrontation applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965); *see State v. Henderson*, 554 S.W.2d 117, 119 (Tenn. 1977). The Tennessee Constitution also guarantees the right of confrontation, providing "[t]hat in all criminal prosecutions, the accused hath the right to . . . meet the witnesses face to face . . . ." Tenn. Const. art. I, § 9. Although the language of the federal and state constitutional provisions differ slightly, the Tennessee Supreme Court has "traditionally adopted and applied the standards enunciated by the United States Supreme Court" when determining an accused's right to confront under the Tennessee Constitution. *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008) (citing *State v. Lewis*, 235 S.W.3d 136, 144 (Tenn. 2007)).

In the present case, the Defendant objected to Dr. King testifying on the basis that he merely had conducted a "cursory external examination" of the victim's body and, thus, could not testify about the cause of death. The Defendant contended that the testimony would violate his right to confrontation pursuant to the Sixth Amendment of the United States Constitution, because the Knoxville pathologist, who officially determined the cause of death, would not be present to testify. The trial court conducted a jury-out hearing to determine what limitations should be placed on Dr. King's testimony. At the conclusion of the hearing, the trial court held that it agreed that Dr. King's testimony raised a confrontation clause issue, but it ruled that Dr. King could testify about the cause of death based "on his own observation [of the victim's body] and conclusions based on his own observations." The

trial court held that Dr. King could testify to his own "expert opinion" and clarify for the jury that he had "relied on the [Knoxville pathologist's] report," but he could not testify as to what was in the report or any of the Knoxville pathologist's conclusions.

In the presence of the jury, Dr. King testified to the following specifically related to his examination of the victim's body and the victim's cause of death:

> [In an external exam of the victim,] [w]e observed the [victim] had a wound to his left side of his neck, which looked like a cutting type wound or a stab wound. And there was a lot of blood on the outside of the body on the skin and clothing. I didn't see any other injuries to the body, but I didn't want to disturb the body, to disturb the medical evidence, so I didn't clean [the body] up, remove his clothing, and do further examination.
>
> . . . .
>
> [A] stab wound that passes into the body at that point on the neck and goes downward could potentially hit blood vessels coming down the left side of the neck, could potentially hit the airway, more in the center of the chest. It could hit the left lung. . . . It could hit the aorta. . . . There are blood vessels also that connect the heart to the lungs. All of this would be in the center of the chest, up high . . . . Any of those type structures would be potentially in the way of a stab wound like this.

Dr. King went on to say that his examination of the body revealed nothing that could have caused the victim's death, other than the stab wound, and that his conclusion was confirmed by the autopsy report sent to him by the Knoxville pathologist.

We conclude that the trial court properly allowed the medical examiner's testimony on this issue because the testimony, in context, demonstrated that Dr. King had done an "external" exam of the body and that his conclusion related to the cause of death was based on his examination. His testimony about the Knoxville pathologist's report was that the autopsy "confirm[ed]" his conclusion that the cause of death was a stab wound to the neck. Dr. King's testimony about the cause of death was based on his first hand knowledge and examination of the body, not the findings contained in the Knoxville pathologist's report. The trial court strictly limited his testimony to the same and made it very clear that Dr. King would not be permitted to testify about the Knoxville pathologist's conclusion; the trial court sustained the Defendant's objection when Dr. King mentioned what the pathologist's office reported. We further conclude that his testimony did not present an issue related to confrontation of a witness, as evidenced by the fact that the trial court did not allow Dr. King

to testify to the conclusions of the pathologist, and the fact that Dr. King only testified about his own observations and conclusions from his examination. Accordingly, the trial court did not abuse its discretion when it allowed Dr. King to testify as an expert as to the victim's cause of death, based on his own examination of the body. The Defendant is not entitled to relief.

## C. Sentencing

The Defendant lastly contends that the trial court erred when it imposed a Range II thirty-five year sentence by improperly applying enhancement factors to his sentence and failing to apply any mitigating factors. The State responds that the Defendant has failed to show that the trial court abused its discretion in imposing the in-range sentence and that the enhancement factors applied to the Defendant's sentence were fully supported by the proof at the sentencing hearing.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2012); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008). In 2005, the Tennessee General Assembly amended the sentencing law in order to bring Tennessee's sentencing scheme into compliance with United States Supreme Court rulings on the subject. *See United States v. Booker*, 543 U.S. 220 (2005); *Blakely v. Washington*, 542 U.S. 296 (2004). As a result, the appellate courts were "left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence." *Carter*, 254 S.W.3d at 345-46.

Appellate review of sentences has been *de novo* with a presumption of correctness. *See* T.C.A. § 40-35-401(d) (2012). In a recent decision, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *Id.* at 708; *State v. Caudle*, 338 S.W.3d 273, 278-79 (Tenn. 2012) (explicitly applying the same standard to questions related to probation or any other alternative sentence).

A holding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting

*State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*.; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708.

The misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from a trial court's sentencing decision. *Id.* A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id.* at 707. So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld. *Id.*

In conducting its review, this Court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102, -103, -210 (2012); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. *See* T.C.A. § 40-35-401, *Sentencing Comm'n Cmts*.

In the present case, the trial court applied the following enhancement factors to the Defendant's sentence, as enumerated in Tennessee Code Annotated section § 40-35-114:

(1) The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;

    . . . .

(8) The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community;

(9) The defendant possessed or employed a firearm, explosive device or other

-10-

deadly weapon during the commission of the offense;

. . . .

(13) At the time the felony was committed, one (1) of the following classifications was applicable to the defendant:

. . . .

(C) Released on probation;

T.C.A. § 40-35-144 (1), (8), (9), and (13) (2012). The trial court further stated that it was considering the mitigating factors raised by the Defendant but that it did not give great weight to any of the factors.

We conclude that the evidence supports the trial court's application of four enhancement factors and that the trial court did not abuse its discretion when it imposed a thirty-five year sentence. As evidenced by the presentence report, the Defendant has a history of criminal convictions, spanning twenty years. *See* T.C.A. § 40-35-114(1). The Defendant was also on probation at the time of this crime and had violated the conditions of his community release on previous occasions. *See* T.C.A. § 40-35-114(8) and (13). Finally, the evidence at trial was that the Defendant committed the crime using a deadly weapon. *See* T.C.A. § 40-35-114(9). The trial court imposed an in-range sentence of thirty-five years. In sentencing matters we are to afford the trial court a presumption of reasonableness, and in so doing, we cannot conclude in this case that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances, i.e., that the Defendant killed his seventeen-year-old stepson by stabbing him in an argument over a cigarette. Accordingly, the trial court did not abuse its discretion when it sentenced the Defendant.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

-11-